UNITED STATES of America,
Appellee,

v.

Samuel G. BENO, Defendant-Appellant.

No. 460, Docket 28796.

United States Court of Appeals
Second Circuit.

Argued May 12, 1964.

Decided May 28, 1964.

Certiorari Denied Oct. 19, 1964.
See 85 S.Ct. 147.

See also 2 Cir., 324 F.2d 582.

Robert C. Zampano, U. S. Atty., District of Connecticut, New Haven, Conn., for appellee.

W. Paul Flynn, of Kopkind & Flynn, New Haven, Conn. (Frank J. Raccio, New Haven, Conn., on the brief), for defendant-appellant.

Before KAUFMAN and HAYS, Circuit Judges, and BARTELS, District Judge.*

KAUFMAN, Circuit Judge.

After we reversed and remanded his initial conviction for accepting a gratuity with the intention that it influence his official conduct, because incompetent and prejudicial evidence was admitted at his first trial, 324 F.2d 582 (2d Cir. 1963), Internal Revenue Agent Samuel G. Beno was again tried and convicted for the same offense. Asserting that his "involuntary admissions" were improperly admitted on his second trial, Beno again appeals.

Virtually all of the relevant facts were fully set forth in our opinion on Beno's first appeal, and it is unnecessary to restate them here in any detail. For present purposes, it is sufficient to note that the chain of events leading to Beno's arrest commenced when the defendant noticed the name of Charles Guinta, listed on the income tax return of the Walden Book Company of Stamford, Connecticut, as treasurer of the company. Since he had previously known an accountant by the name of Richard Guinta, Beno telephoned Richard, informed him that Walden's return was before him for an audit, and asked whether Richard and Charles were related. When he was told that the two were brothers, Beno informed Richard that he was interested in obtaining a set of the Encyclopaedia Britannica and a "good dictionary," to which Richard replied that the message would be forwarded to Charles. Subsequently, before Richard was able to tell Charles of Beno's call, the defendant again phoned Richard, and, in Richard's words at the trial, "mentioned * * * [that] * * * he was interested in an arrangement whereby the books could be mailed to him, and * * * that he would survey the return and mark it 'No tax potential.'"

* Sitting by designation.

Immediately upon being informed by Richard of his conversations with Beno, Charles notified the inspection division of the Internal Revenue Service in Boston. And, as revealed through Charles' testimony at trial, the Service requested his cooperation "in finding out whether or not this man [Beno] was merely wishing to purchase a set of encyclopaedia and dictionary, or perhaps solicit a gift." Accordingly, Charles telephoned Beno, and, after Beno told him that he had been assigned Walden's return and "that there would be no problem in it * * * he would survey it," a meeting was arranged between Beno and Charles in the latter's office on October 2, 1961. Without Beno's knowledge, it was planned that a Fargo tape recorder would be hidden in the office, and that a Minifon recorder would be secreted on Charles' person so that the ensuing conversation might be recorded.[1] In addition, as it turned out, Internal Revenue agents were stationed in a room adjoining Charles' office, and, by means of a headset connected to the tape recording apparatus, were enabled to overhear the October 2nd conversation as it was in progress.

At the trial, Charles testified that the agents provided him with general instructions concerning the course of his conversation with Beno. Thus, in light of Beno's earlier remarks to both Guintas, Charles was instructed to discover "what a survey was all about," as well as to "ask Mr. Beno about my own personal return, to give Mr. Beno every opportunity to pay for the books, be sure to tell him what the price of the books were, be sure to tell him that this was a no-discount item, and to give him every

opportunity to pay for the books." As recounted by Charles at trial, the agents "repeated several times that they were interested in getting the facts and to determine whether or not there was any wrong-doing here."

The October 2nd conversation took place as planned. Although, as we indicated in our earlier opinion, Beno did not provide the prosecution with "plainly incriminating admissions," 324 F.2d at 583, he never offered to pay for the books, and the jury properly could have found from all the evidence and circumstances that Beno was subtly promising to relieve Walden of any potential tax difficulties if Charles were generous enough to supply the books without charge, or in short, that he solicited a bribe. In any event, Charles gave Beno the encyclopaedia and the dictionary, and, after they were placed in Beno's car, the defendant was arrested by the Revenue agents.

At the trial, Charles testified as to his October 2nd conversation with Beno, and the tape and Minifon recording of that conversation were placed into evidence and played for the jury. On appeal, in a claim vaguely based on the Fourth and Fifth Amendments, Reno appears to contend that the conversation with Charles, prearranged and recorded by government agents, was in some respect illegal, and that Guinta's recounting of Beno's end of the conversation thus represented an improper attempt to introduce "involuntary admissions" of the defendant. The same claim seems to be made with respect to the introduction of Exhibits H and I, the recordings of the conversation, and to the playing back of portions of these to the jury.[2]

---

1. The tape recorder was designed to record any conversation which took place in Charles' office; the Minifon was also able to pick up any additional statements made after Charles and Beno left the office. So as to eliminate duplication at trial, only the Fargo tape was played with respect to the office conversation, and only those portions of the Minifon recording which related to the discussion after Charles and Beno left the office were played for the jury.

2. There is some question on appeal as to whether Beno made a timely objection at trial to the introduction and playbacks of the tape and Minifon recording. While the issue is not clear, and although it might be argued that any objections, even if made, were waived, we will assume for present purposes that all objections were raised in the proper fashion and adhered to.

At the outset, it would be helpful to clarify several aspects of the defendant's arguments on appeal. First, Beno has at no time—either here or below—raised any question of a possible claim of entrapment, and, in fact, the defense was explicitly disclaimed at trial. There is, therefore, no contention that Beno was "lured" into committing an offense—either by the government agents, or by Charles Guinta, acting on their behalf. Compare Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). Secondly, as the statements of the government agents make plain, the October 2nd conversation transpired when the charges against Beno were at most in the investigatory stage; the agents were simply "interested in getting the facts and to determine whether or not there was any wrong-doing." Accordingly, decisions which deal with post-indictment questioning of a defendant are wholly in apposite. See Massiah v. United States, 377 U.S. ——, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); People v. Waterman, 9 N.Y.2d 561, 216 N.Y.S.2d 70, 175 N.E.2d 445 (1961).[3]

With these considerations in mind, it is clear that Beno's amorphous contentions are wholly without merit. In the first place, it seems plain that anything which Beno may have said during the course of the October 2nd conversation is not to be considered as an "admission," made *after* the commission of the offense. The words constituted, instead, *the commission of the crime itself*. See Todisco v. United States, 298 F.2d 208, 212 (9th Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 602, 7 L.Ed.2d 527 (1962). If Beno was found to have been subtly soliciting a bribe, he was *at that moment* violating the law; absent a claim of entrapment, we can perceive of no reason why Guinta might not testify as to the defendant's attempts to solicit the bribe. In short, Beno's efforts to strike

Guinta's testimony as embracing "involuntary admissions" seem almost frivolous; bribery statutes would have little meaning if a victim were not permitted to testify that he had been asked for a bribe. It being true that Guinta might clearly testify as to the dialogue between Beno and himself during the bribe solicitation incident, there would seem no reason why the recorded versions of this dialogue—as embodying a far more accurate reconstruction than Guinta's recollections—could not also be introduced, and played for the jury. As the Supreme Court observed in relation to the playback of a tape which contained an incriminating conversation between the defendant and a government agent, "the [recording] device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose." Lopez v. United States, 373 U.S. 427, 439, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462 (1963).

Secondly, constitutional claims, similar to and stronger than those invoked by Beno, have been repeatedly rejected in a long line of cases. See, e. g., On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); United States v. Kabot, 295 F.2d 848 (2d Cir. 1961), cert. denied, 369 U.S. 803, 82 S.Ct. 641, 7 L.Ed.2d 550 (1962). In On Lee, the defendant's friend was "wired for sound" and entered On Lee's laundry to conduct a conversation with him *while the defendant was at large on bail and awaiting trial*. Affirming On Lee's conviction, the Supreme Court held that a government agent who had been standing outside the laundry was properly permitted to testify as to the defendant's admissions, which the agent had heard through a receiver connected to the trans-

3. Indeed, the Supreme Court in Massiah was careful to note that "it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted." In the present case, where Beno had not even been arrested at the time of the conversation in question, his argument is all the weaker.

672

mitter carried by the cooperating friend. More recently, in Lopez, the Supreme Court cited On Lee in approving the receipt into evidence of a tape recording, made when a *government agent* secreted a recorder on his person during a conversation with the defendant *in the defendant's office*. And finally, in a bribery case virtually identical to this one, a recorded conversation pre-arranged by government agents was held properly admitted by this court in Kabot.

Here, the government agents were engaged in an honest attempt to discover the nature of Beno's conduct; the conversation took place in Charles Guinta's office with his consent; Charles was not a government agent but a private citizen; and, the case was still in the investigatory and pre-arrest stage. It follows, therefore, that Beno's contentions are considerably weaker than those rejected in On Lee and Lopez and are certainly no stronger than those which we found unpersuasive in Kabot. The recordings were hence properly received in evidence. Since Beno's other contentions are without merit, the conviction is affirmed.