**STATE of Iowa, Plaintiff,**

**v.**

**Gibson C. HOLLIDAY, Judge of the Ninth Judicial District of Iowa, Defendant.**

**No. 53445.**

Supreme Court of Iowa.

July 24, 1969.

Richard C. Turner, Atty. Gen., and David A. Elderkin, Asst. Atty. Gen., for plaintiff.

Ben E. Kubby and John P. Roehrick, Des Moines, for defendant.

SNELL, Justice.

This case is before us on certiorari to review an order of the trial court sustaining a motion to suppress evidence of a pen register attached to a subscriber's telephone line.

On March 7, 1968 the Polk County grand jury returned an indictment charging Marlene James with the crime of making a threatening telephone call as defined in Chapter 416, Acts of the 62nd General Assembly of the State of Iowa. This statute makes unlawful and provides a penalty for making telephone calls such as were alleged.

Attached to the indictment were minutes of testimony of witnesses. A brief summary will suffice for our present problem.

Marilou J. McMurray testified that she had received numerous, anonymous, threatening and abusive telephone calls. (Over 70 between April 1967 and October 1967). She knew Marlene James and recognized the voice of the caller as the voice of Mrs. James. Mrs. McMurray complained to the telephone company. The telephone company service representative requested she keep a record of the calls. She did so. The telephone company attached a pen register to Mrs. James' telephone line. The pen register produced a record of the telephone numbers called from Mrs. James' phone. It showed that Mrs. McMurray's number was called five times between 9:00 a.m. October 8, 1967 and 8:30 a.m. October 9, 1967. This record corresponded to the record kept by Mrs. McMurray.

Defendant, Marlene James, moved to suppress all evidence obtained as a result of the pen register attached to her telephone line "at the request of one Marilou J. McMurray" as violative of her constitutional rights.

At the hearing on this motion it appeared that the pen register had been used without the knowledge or consent of Mrs. James.

An explanation and exhibit from a pen register illustrated that only the numbers called were recorded. There was no listening to or recording of any voice or message of any kind. It does not appear that the machine was capable of doing more than record the numbers.

The court's calendar shows: "Motion to Suppress — 'Pen-Register' sustained." The transcript shows:

"THE COURT: It will be the ruling of the Court that the Motion to Suppress will be sustained insofar as the information or data taken by the pen register from the telephone number of the defendant on October 8, 1968, which was without her permission or sanction. That is the only part that will be suppressed.

"It is my understanding that the Supreme Court of the United States has ruled that that cannot be done. That is the extent of the ruling of the Court."

On petition of the State and after hearing we granted certiorari and stayed lower court proceedings until determination herein or further order. Return to the writ has been made.

In this determination the State as petitioner is plaintiff and the respondent judge is defendant.

■ I. It is first urged by defendant herein "that the ruling of the trial court was within his judicial discretion, and was not in fact an illegal ruling, such as to allow review by means of certiorari."

We do not agree.

We have before us law questions only. We are not now reviewing fact questions.

In State ex rel. Rankin v. Peisen, 233 Iowa 865, 868, 10 N.W.2d 645, we reviewed the function of certiorari. We held the case involved law questions only and that the trial court's ruling was reviewable by certiorari.

In State v. Rees, 258 Iowa 813, 816, 139 N.W.2d 406, we said:

"Accused contends certiorari will not stand to test an order of Court suppress-

ing evidence in a criminal case. We do not agree. In Hohl v. Board of Education, 250 Iowa 502, 94 N.W.2d 787, we recognized a tendency to broaden the scope of certiorari where no appeal is permitted, and substantial justice would not be done unless review by certiorari be allowed.

"In State ex rel. Fletcher v. District Court, 213 Iowa 822, 238 N.W. 290, 80 A.L.R. 339, we recognized the common law right of the State to review by certiorari in criminal cases under certain circumstances.

"A review of the law issue here presented is fully warranted. If this review were to be refused the State, if correct in the position taken, would be faced with a prosecution of the accused unjustly and irreparably deprived of material evidence. See State ex rel. Rankin v. Peisen, 233 Iowa 865, 868, 10 N.W.2d 645; State v. District Court, 248 Iowa 250, 253, 80 N.W.2d 555."

In State v. Eads, Iowa, 166 N.W.2d 766, 768, we said:

"The State seeks to test the legality of this order by writ of certiorari. This is permissible under our previous holdings. [Citations]"

II. The Motion to Suppress Evidence was based on claimed invasion of constitutional rights with particular reference to the Fourth and Fifth Amendments to the Constitution of the United States.

■ Neither of these amendments has any application to the case before us. The Fourth Amendment guards against unreasonable searches and seizures.

There is not a scintilla of evidence that the pen register was attached to the telephone line at the request of the police or any prosecution agency.

■ "Constitutional provisions prohibiting unreasonable searches and seizures are intended to protect against action by the government, its officials and agents, and neither the federal provision nor those of the states have any application to the unauthorized acts of private individuals." 79 C.J.S. Searches and Seizures § 5c, page 783.

"The rule under which evidence obtained by an unlawful search and seizure is not admissible against an accused has been held not to apply where the unlawful search was made by a private individual acting on his own initiative. Thus, a trespasser may testify to pertinent facts observed by him or may put in evidence pertinent articles or papers found by him while trespassing; he may be held responsible civilly and, perhaps, criminally for the trespass, but his testimony is not thereby rendered incompetent. It has likewise been held that evidence disclosed by an employer's search of his employee's car, where the employer then reported the employee to the police, was not inadmissible in the prosecution of the employee for theft. Similarly, it has been held that shoplifting evidence obtained in an unreasonable search and seizure by a private store detective and subsequently delivered to the state prosecuting authorities was admissible. However, if the private person perpetrates a lawless entry and seizure as the agent of public officials, the vicarious violation of constitutional limitations demands invocation of the exclusionary rule." 29 Am.Jur.2d, Evidence, § 417, page 476. Citing Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048, 13 A.L.R. 1159, People v. Tarantino, 45 Cal.2d 590, 290 P.2d 505, People v. Fierro, 236 Cal.App.2d 344, 46 Cal.Rptr. 132, Sackler v. Sackler, 15 N.Y.2d 40, 255 N.Y.S.2d 83, 203 N.E.2d 481, 5 A.L.R.3d 664. See also Irvine v. California, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561.

■■ Thus it appears well settled that the Fourth Amendment restriction against unreasonable searches and seizures applies to federal and state officers but not to private persons who are acting on their own. Burdeau v. McDowell, supra. See also Harmon v. Commonwealth, discussed infra. The evidence so obtained by an individual

does not fall within the exclusionary rule and is admissible in a trial. The parties involved in the use of the pen register are the telephone company and the complaining witness neither of whom is an agent of federal or state governments.

III. The Fifth Amendment protects an accused from being compelled "to be a witness against himself."

■ .The Fourteenth Amendment makes the Fifth Amendment applicable to proceedings in state courts. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653. The pen register involved here is not within the purview of the Fifth Amendment.

■ Here there was no compulsion, no interrogation, no evidence of any response by anyone, no harassment of the person calling, no abuse, no eavesdropping, no interruption of any call, no recording of any conversation or ·voice, no identification of who was calling. There was nothing beyond a mechanically made record of the telephone numbers called from the number of the line to which the pen register was attached.

It should be kept in mind that we are not here considering a case of eavesdropping and listening by means of a wire tap or electronic "bugging" that permits eavesdropping by microphone rather than wire tap. See discussion of these devices and prohibitory statutes in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040, mentioned, infra.

■ Reduced to simple terms and stripped of its many ramifications the purpose of the Fifth Amendment was to guard against torture induced confessions and to protect an accused from being forced to convict himself by his own words.

■ There is nothing in the Fifth Amendment that bars evidence as to what an accused voluntarily said or did. The bar is against what an accused was forced to say.

Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, involved the use of a blood analysis. There was no voluntary consent to the withdrawal of defendant's blood. The court held that there was no constitutional protection against the use of such evidence. These statements appear:

"We hold that the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and that the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends.

"It could not be denied that in requiring petitioner to submit to the withdrawal and chemical analysis of his blood the State compelled him to submit to an attempt to discover evidence that might be used to prosecute him for a criminal offense. He submitted only after the police officer rejected his objection and directed the physician to proceed. The officer's direction to the physician to administer the test over petitioner's objection constituted compulsion for the purposes of the privilege. The critical question, then, is whether petitioner was thus compelled 'to be a witness against himself.' * * *

"* * * both federal and state courts have usually hèld that it [the 5th Amendment] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it.

\* \* \* \* \* \*

"Not even a shadow of testimonial compulsion upon or enforced communication by

the accused was involved either in the extraction or in the chemical analysis. Petitioner's testimonial capacities were in no way implicated; indeed, his participation, except as a donor, was irrelevant to the results of the test, which depend on chemical analysis and on that alone. Since the blood test evidence, although an incriminating product of compulsion, was neither petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner, it was not inadmissible on privilege grounds."

Warden, Maryland Penitentiary, v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, cites, and follows Schmerber and permits use of evidence that is not "testimonial" or "communicative" in nature. The court also struck down and rejected the "mere evidence" rule making a distinction "between seizure of items of evidential value only and seizure of instrumentalities, fruits, or contraband. * * *"

Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 involved testimony of an informer (undercover agent) about statements made by the accused. The testimony was challenged under the Fifth Amendment. We quote:

"The petitioner argues that his right under the Fifth Amendment not to 'be compelled in any criminal case to be a witness against himself' was violated by the admission of Partin's testimony. The claim is without merit.

"There have been sharply differing views within the Court as to the ultimate reach of the Fifth Amendment right against compulsory self-incrimination. Some of those differences were aired last Term in Miranda v. Arizona, 384 U.S. 436, 499, 504, 526, 86 S.Ct. 1602, 1640, 1643, 1654, 16 L.Ed.2d 694. But since at least as long ago as 1807, when Chief Justice Marshall first gave attention to the matter in the trial of Aaron Burr, all have agreed that a necessary element of compulsory self-incrimination is some kind of compulsion. Thus, in the Mir-

anda case, dealing with the Fifth Amendment's impact upon police interrogation of persons in custody, the Court predicated its decision upon the conclusion 'that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. * * *' 384 U.S., at 467, 86 S.Ct. at 1624, 16 L.Ed.2d 694.

"In the present case no claim has been or could be made that the petitioner's incriminating statements were the product of any sort of coercion, legal or factual. The petitioner's conversations with Partin and in Partin's presence were wholly voluntary. For that reason, if for no other, it is clear that no right protected by the Fifth Amendment privilege against compulsory self-incrimination was violated in this case."

We conclude that there was no showing here of any invasion of the accused's constitutional rights.

IV. In the trial court the motion to suppress evidence was based on claimed violation of constitutional rights. The extent, if at all, to which federal statutes may have been called to the attention of the court does not appear. The court's order does not disclose whether it was based on an understanding of the Supreme Court's constitutional or statutory interpretation. In this appeal the main thrust of the arguments goes to the federal statutes, i.e. section 605 of the Communications Act of 1934 and section 2515 of Title 18, U.S.C.A., Omnibus Crime Bill of 1968.

Our problem is the application of these statutes to the case at bar.

V. In 1934 the Congress outlawed the interception without authorization and the divulging or publishing of the contents of wiretaps by passing § 605 of the Communications Act of 1934. 48 Stat. 1103, 47

U.S.C.A. § 605. This statute to the extent germane to our problem provides:

"No person * * * not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents * * * of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any * * * communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; and no person having received such intercepted communication or having become acquainted with the contents * * * knowing that such information was so obtained, shall divulge or publish the existence, contents, * * * of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto * * *."

This summary of the development of wire tap laws is from Berger v. New York, supra:

"As science developed these detection techniques, lawmakers, sensing the resulting invasion of individual privacy, have provided some statutory protection for the public. Seven States, California, Illinois, Maryland, Massachusetts, Nevada, New York, and Oregon, prohibit surreptitious eavesdropping by mechanical or electronic device. However, all save Illinois permit official court-ordered eavesdropping. Some 36 States prohibit wiretapping. But of these, 27 permit 'authorized' interception of some type."

In Iowa wiretapping is an indictable misdemeanor, § 716.8, Code of Iowa, but the Iowa statute is not involved here. See Division II, supra.

A review of the federal judicial history and of cases followed and overruled appears in Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166, decided June 17, 1968. That case held the federal statute applicable to the states.

In that case there was a wiretap by the police and for more than a week the police used this equipment to overhear and record telephone calls to and from the residence. The recordings of the telephone conversations were held inadmissible in the state court.

We have no comparable situation in the case at bar. Here there was no wiretap by police and no interception or recording of any conversation.

In Fuller v. Alaska, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212, Lee was held to apply "only to trials in which the evidence is sought to be introduced after the date" of the decision.

In the case at bar the ruling on the motion to suppress antedated the decision in Lee, but the actual trial will be subsequent.

Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 was decided December 18, 1967. It involved the admissibility of evidence obtained by F.B.I. agents who overheard and recorded by means of an electronic device telephone calls made from a public telephone booth. The court said:

" * * * the Fourth Amendment protects people, not places. * * *

"No less than an individual in a business office, in a friend's apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication."

The evidence was held not admissible.

▆ The holding in Katz is not applicable to the case before us. The pen register was attached to the telephone line from

October 2 to October 9, 1967. The evidence sought to be suppressed was limited to that period of time.

The Supreme Court on March 24, 1969 in Desist, et al. v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248, said: "We hold that Katz is to be applied only to cases in which the prosecution seeks to introduce the fruits of electronic surveillance *conducted after December 18, 1967.*" Emphasis added.

In the case before us under this pronouncement there is no constitutional bar to the pen register evidence.

VI. The files show a written "Authorization for Line Identification" signed by Mrs. McMurray. It authorizes disclosure to law enforcement personnel.

■■■ The motion to suppress stated and this case has been argued here on the premise that the pen register was used at the request of the complaining witness.

From this premise the position of the State is supported by Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134.

In that case, at the request of the complaining witness, the police listened on an extension phone to a threatening message. The call had been anticipated. At trial the police officers testified. The court said:

"Since there was a divulgence of the contents of a communication, the only issue on the facts before us is whether there has been a unauthorized interception within the meaning of Section 605. The federal courts have split in their determination of this question. Some courts have held that the statute proscribes the use of an extension telephone to allow someone to overhear a conversation without the consent of both parties. Others have concluded that the statute is inapplicable where one party has consented. We hold that Section 605 was not violated in the case before us because there has been no 'interception' as Congress

intended that the word be used. Every statute must be interpreted in the light of reason and common understanding to reach the results intended by the legislature. [Citations] That principle would be violated if we attributed to Congress acceptance of the results that would occur here from the position argued by petitioner.

"The telephone extension is a widely used instrument of home and office, yet with nothing to evidence congressional intent, petitioner argues that Congress meant to place a severe restriction on its ordinary use by subscribers, denying them the right to allow a family member, an employee, a trusted friend, or even the police to listen to a conversation to which a subscriber is a party. Section 605 points to the opposite conclusion. Immediately following the portion quoted above, the statute continues:

"' * * * no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto * * *.'

"The clear inference is that one entitled to receive the communication may use it for his own benefit or have another use it for him. The communication itself is not privileged, and one party may not force the other to secrecy merely by using a telephone. * * *"

VII. In United States v. Sugden, 226 F.2d 281 (9th Cir., 1955), an agent of the Federal Communications was monitoring the air waves for violations by radio stations in Arizona. He overheard the defendant on a private radio talking of hiding Mexican "wetbacks" (illegal entrants). He reported this to the Immigration Office who found it to be true and charged the defendant. The defendant urged suppression of the evidence. The Court of Appeals held that intercepted radio communications made over a licensed farm radio station by an unlicensed operator

were not protected by § 605 and were not subject to suppression, but communications broadcast after the operators were licensed were protected and subject to suppression.

The substance of the holding (to the extent applicable here) is that if the use of a communication facility is illegal, the right of privacy does not exist and the matter may be divulged.

We will refer to this proposition in a subsequent division.

VIII. In Hanna v. United States, 404 F.2d 405 (5th Cir., 1968), a motion to suppress was denied by Federal District Court. The court of appeals after rehearing affirmed. The telephone company recorded the calls defendant made to see if he was using a "blue box" to avoid paying toll charges. After the telephone company determined he was involved in a fraud, it notified the Department of Justice that it knew of a fraud and would disclose it if subpoenaed. There was no disclosure of defendant's name or telephone number prior to the issuance of a subpoena. As a result federal authorities were led to gambling equipment in the possession of the defendant and he was convicted.

This decision held that the telephone company has a right to determine if its facilities are being used illegally. The court then stated:

"It must, therefore, be conceded that when the use of the communication facility itself is illegal, section 605 has no application, at least insofar as concerns the person guilty of such illegal users. * * *

"Section 605 provides that information thus lawfully obtained may be divulged 'in response to a subpoena issued by a court of competent jurisdiction, or on demand of other lawful authority.' It now appears that the existence and parts of the contents of the communications were both lawfully obtained and lawfully divulged, and that there was no violation of section 605."

IX. The most recent pronouncement coming to our attention and involving an almost identical factual situation is in Harmon v. Commonwealth of Virginia, 166 S.E.2d 232. The case was decided by Supreme Court of Appeals of Virginia on March 10, 1969. In that case the complaining witness received a number of obscene telephone calls over her parents' telephone. She recognized the voice of the caller. The case is so clearly in point that we quote at some length.

"At the request of her parents a number of these calls were traced to the telephone at the residence of N. M. Harmon on Taylor Road in the city of Chesapeake, where the defendant resided. Subsequently the assistant manager of the telephone company in Portsmouth directed that a 'pen register' be attached in the central telephone office to the telephone line leading to the Harmon residence. This device recorded the fact that on certain days and at certain times the Harmon telephone had dialed certain other telephones. It did not record the conversations had at these times.

"This official of the company testified that the device was attached to the Harmon telephone line at his direction and upon his responsibility, and that this was done with the knowledge and consent of the Reed family but without the knowledge or permission of the subscriber to the Harmon telephone.

"Miss Reed testified that she received a number of obscene telephone calls on September 13, 14 and 20, 1966. The pen register showed that on these dates and at the times specified by Miss Reed the telephone at the Harmon residence dialed the telephone at the Reed residence. * * *

"At the trial below the defendant moved to suppress this evidence obtained by the use of the pen register, on the grounds that (1) it violated the defendant's right of privacy in violation of the Fourth Amendment to the Federal Constitution, and (2) it was in violation of § 605 of the Federal Communications Act of 1934, 47 U.S.C. § 605. * * *"

The first contention was disposed of in the same manner and on the basis of the same authorities considered in our Division II, supra.

"We come next to determine whether § 605 of the Federal Communications Act, 47 U.S.C. § 605, prohibits the admission in evidence of the recordation of calls emanating from the Harmon telephone. This section of the Act provides:

" '[N]o person not being authorized by the sender shall intercept any communication and divulge * * * the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person * * *.'

"There are a large number of cases in both the federal and state courts interpreting and applying this section. In none of these has the precise question here presented been decided.

"In Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), it was held that where the party receiving a telephone message consented to the listening thereto by another person on an extension line, this did not constitute an unauthorized interception of the communication forbidden by the statute. (355 U.S. at 111, 78 S.Ct. 161.) Following this decision a number of courts have held that the statute does not proscribe the interception or recording of a telephone conversation made with the consent of one of the communicating parties. Among these are, Battaglia v. United States, 349 F.2d 556, 559 (9th Cir., 1965); Lindsey v. United States, 332 F.2d 688, 691 (9th Cir., 1964); United States v. Campbell, 337 F.2d 396, 398 (7th Cir., 1964); United States v. McGuire, 381 F.2d 306, 314 (2d Cir., 1967).

\* \* \* \* \* \*

"In the case before us, as has been said, the pen register was attached to the Harmon telephone line with the knowledge and consent of Miss Reed, the intended recipient of the calls. If, under the holding in the Rathbun case the listening by a third party to a telephone conversation with the consent of one of the parties to the conversation was not an interception of communication forbidden by the statute, then surely the showing, made with the consent of Miss Reed, the intended recipient of the messages, that certain calls had been made from the telephone of the defendant to her telephone was not a violation of the federal statute.

"Accordingly, we hold that in the present case the evidence obtained by the use of the pen register, under the related circumstances, was not in violation of the federal statute and therefore inadmissible."

In United States v. Dote, 371 F.2d 176 (7th Cir., 1966), at the request of the Internal Revenue Service, the telephone company installed pen registers on lines used by bookmaking wirerooms. "Neither the wirerooms, the defendants, nor any of the parties called knew of or acquiesced in this request by the Revenue Service." (loc. cit. 179)

The Virginia court clearly distinguishes the case.

We agree with the reasoning of the Virginia court and hold that the evidence relative to and taken from the pen register was admissible.

X. The ruling on the motion to suppress in this case was made on June 4, 1968. On June 19, 1968 the Congress enacted what is referred to as the Omnibus Crime Bill of 1968, Title III. The pertinent parts now appear in chapter 119, Title 18, U.S. C.A. The parties herein respectively argue that this law is not applicable to the case at bar, but for entirely different reasons.

Defendant argues that because of the date of enactment it is not applicable to the case at bar. It is clear that it was not statutory law in October 1967 when the pen register was used nor on June 4, 1968 when the trial court ruled.

Because of our holding in prior divisions we need not determine the extent, if at all, to which it will be applicable at a later trial. Plaintiff argues that the 1968 act is not applicable because it does not proscribe what was done here. Some of the provisions lend support to this argument.

Section 2510(4) provides:

" '[I]ntercept' means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device."

Section 2511(2) (d) provides:

"It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act."

Section 2515 provides:

"Prohibition of use as evidence of intercepted wire or oral communications.

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

These provisions are applicable here as an indication of the intent of the Congress and to that extent support the position of plaintiff.

XI. Chapter 416, Laws of the 62nd General Assembly, under which the indictment here involved was returned provides in part:

"It shall be unlawful for any person, with intent to terrify, intimidate, threaten, harass, annoy or offend, to telephone another and use any obscene, lewd or profane language or suggest any lewd or lascivious act, or threaten to inflict injury or physical harm to the person or property of any person. It shall also be unlawful to attempt to extort money or other thing of value from any person, or to otherwise disturb by repeated annonymous (sic) telephone calls the peace, quiet or right of privacy of any person at the place where the telephone call or calls were received."

Under this statute the telephone is the facility or instrumentality by and through which the crime is committed. Except by use of a telephone there could be no crime under this particular statute.

 We know of no authority holding that a telephone subscriber is authorized to use his telephone to commit a crime. Property used in commission of a crime is ordinarily treated as contraband. A telephone subscribed is a lessee, not an owner. The equipment is owned by the telephone company. It would be unsound to hold that a telephone company must sit idly by when it has information as to illegal use of its property. It would be equally unsound to hold that information obtained by a telephone company as to illegal use of its property may not be divulged.

See quotation from Hanna v. United States, division VIII, supra.

XII. We quote from plaintiff's brief:

"The pen register is generally used by telephone companys in such areas as service observing and checking on alleged customer billing irregularities. With Bell System annoyance call complaints now running in excess of three-quarters of a million annually, however, the further use of that

device for annoying call line identification is obviously a normal and necessary incident to the proper rendition of service. Most of such calls, as here, offend the criminal law and constitute an abuse of service under telephone company tariffs—clearly action must be taken both for the company's protection and that of their subscribers."

The enactment by the Congress of the Omnibus Crime Bill of 1968 clearly indicates the concern about the problem.

We would be reluctant to say that legitimate procedures may not be used in the fight against crime.

XIII. We are unable to find support in the law for the trial court's ruling.

The writ of certiorari is sustained and the case is remanded for entry of an order overruling the motion to suppress evidence.

GARFIELD, C. J., and LARSON, MOORE, STUART and LeGRAND, JJ., concur.

BECKER, J., concurs in the result.

RAWLINGS and MASON, JJ., dissent.

BECKER, Justice.

I concur in the result.

I do not believe this is the type of wire tapping proscribed by our section 716.8, Code, 1966. Further it would seem that a telephone user is bound to know the company is allowed to keep track of the destination and frequency of his calls for rate making, rate charging, equipment demands determination, and other purposes. For this reason I do not believe the individual's right of privacy is unreasonably invaded by use of a pen register.

It is respectfully submitted that Division II of the majority opinion cannot long remain the law. The majority says quite frankly that evidence illegally obtained by a private individual or corporation is not subject to the exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081, and related cases.

This is a perpetuation of the silver platter doctrine. The only difference is that the evidence is furnished by private detectives, private corporations or private individuals as distinguished from public officials. I cannot believe this rationale will live in light of recent constitutional decisions.

The issue is examined in 16 American University Law Review, page 402, 408, Unreasonable Private Searches and Seizures and the Exclusionary Rule. The author concludes: "With the sophistication of our system of law enforcement has come the placing of responsibility for administration of the laws in the hands of government officers and a concomitant granting of greater rights and freedoms to the individual. These rights and freedoms should be protected, not only against the government but against other private individuals as well."

RAWLINGS, Justice (dissenting).

I respectfully dissent.

Assuming, arguendo, the Fourth and Fifth Amendments apply only to federal or state officials, section 605, Federal Communications Act, 47 U.S.C.A. section 605, provides in material part: " * * * *no person not being authorized by the sender shall intercept any communication and divulge* * * * the existence, * * * effect or meaning of such intercepted communication to any person; * * *.*" In this regard see Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166.

MASON, J., joins in this dissent.